(C. D. 1272)

WEIGERT-DAGEN ET AL. *v.* UNITED STATES

United States Customs Court, First Division

(Decided September 12, 1950)

*Tompkins & Tompkins* (*J. Stuart Tompkins* and *Walter Auster* of counsel) for the plaintiffs.

*David N. Edelstein,* Assistant Attorney General (*Dorothy C. Bennett,* special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges; COLE, J., concurring

MOLLISON, Judge: Each of these protests is directed against the assessment of duty by the collectors of customs at the ports of Laredo and St. Louis on "certain leather huaraches" at the rate of 20 per centum ad valorem under the provisions of paragraph 1530 (e) of the Tariff Act of 1930 which read as follows:

PAR. 1530. * * *

\* \* \* \* \* \* \*

(e) Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for,. 20 per centum ad valorem; * * *.

The protest claim in each case is for duty at the rate of 10 per centum ad valorem under the same provision, as modified by the Mexican Trade Agreement reported in T. D. 50797. The said provision, as modified, reads as follows:

| Tariff Act of 1930 paragraph | Description of article | Rate of duty |
|---|---|---|
| 1530 (e) | Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for:<br>　Huaraches_____<br>　Slippers (for housewear)_____ | <br><br><br>10% ad valorem<br>10% ad valorem |
| 1530 (e) | Men's, youths', and boys' boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for (except turn or turned, or sewed or stitched by the process or method known as McKay, or made by the process or method known as welt)_____ | <br><br><br><br><br><br><br>10% ad valorem |

When the protests were called for trial, counsel for the plaintiffs offered motions to amend four of them, namely, 120694–K, 120695–K, 122689–K, and 126181–K, "by adding after the word 'huaraches' the words 'and/or slippers (for housewear)'." Counsel for the Government opposed the motions to amend on the ground that they involve new items of merchandise not covered by the original protests. At a hearing before this division, at which counsel for both sides were heard, the motions to amend were granted. In the brief filed on. behalf of the defendant reconsideration of this ruling is asked, and upon reconsideration the ruling made at the trial is adhered to, exception being allowed to the defendant.

Preliminary to taking up the issues on the merits there are pending and undisposed of certain motions made by counsel for the defendant to dismiss certain of the protests. Counsel for the defendant moved. to dismiss protest No. 110859–K insofar as it relates to entry.5619 on the ground that the same was untimely, the said protest having

been filed more than 60 days after liquidation of the said entry. Counsel for the plaintiffs has conceded that protest No. 110859–K is untimely insofar as it relates to entry 5619, and judgment will therefore issue dismissing the said protest to that extent only.

Counsel for the defendant moved to dismiss protest No. 114383–K insofar as it relates to entry 2013 on the ground that the said protest was filed prior to appraisement and liquidation of the said entry. Counsel for the plaintiffs has conceded that protest No. 114383–K is untimely insofar as it relates to entry 2013, and judgment will therefore issue dismissing the said protest to that extent only.

As to the merchandise claimed by the plaintiffs to consist of huaraches, and consequently to be entitled to assessment at only 10 per centum ad valorem, the contest concerns the meaning to be given to the term "huaraches" as found in the modification of paragraph 1530 (e) by the Mexican Trade Agreement, *supra*. On the part of the defendant it is claimed that the description of "huaraches" formulated by the United States Tariff Commission, and appearing on page 223 of its publication entitled—

Trade Agreement
Between the United States
and
Mexico

Digests of Trade Data with Respect to Products
On which Concessions Were Granted
By the United States

Washington
1943

constitutes a definition limiting the scope of the tariff provision. That description, which appears under the heading "Description and uses," is as follows:

Huaraches are leather-soled sandals having woven-leather uppers laced to the insole. The insole is machine-stitched to the outsole, and the heel is nailed on. They are used principally by women and girls for beach and casual summer wear.

It seems clear from a perusal of exhibit 50, being a Customs Information Exchange circular distributed to customs officers containing the decision of the Bureau of Customs concerning the classification of certain leather footwear claimed by importers to be dutiable as huaraches, and also from the testimony of certain of the defendant's witnesses attached to the Customs Service, that the foregoing Tariff Commission description formed the basis for the collectors' classification of the merchandise here involved which is claimed to be huaraches.

Exhibits 1 to 34, 36 to 39, and 44 to 46, all inclusive, consist of official samples of disputed items, all received in evidence without objection as such, all claimed by the plaintiffs to be huaraches, and all classified as other footwear. (Exhibit 35 is conceded to represent

merchandise under entry 6995 covered by protest 120695–K which was returned by the collector at the 10 per centum rate claimed in the protest. Exhibits 40 to 43, inclusive, consist of merchandise claimed to be dutiable as "Slippers (for housewear)," which will be discussed *infra*.)

An examination of such exhibits shows that they each do not conform to the above definition of the Tariff Commission for a variety of reasons—some because the uppers are only partly rather than wholly woven, some because the uppers are not laced through the insole, some because the insole is attached to the outsole by other than machine stitching, and some because the heel is not nailed on.

The plaintiffs contend that the term "huaraches" has a broader meaning than that expressed in the quoted excerpt from the Tariff Commission publication. As stated by counsel for the plaintiffs at page 139 of the record, it is contended by plaintiffs that—

It is a leather article of footwear with a woven upper and it may be laced wholly or in part to the insole. It may have heels or it may not have heels nailed on. It is not necessary that it be machine-stitched. The inner sole need not necessarily be machine-stitched to the outer sole  *  *  *.

Neither party apparently raises the issue of commercial designation—that is to say, neither party primarily contends that the commercial meaning of the term "huaraches" differs from the common meaning thereof. On the part of the plaintiffs it seems to be contended that the commercial meaning is the same as the common meaning, and the plaintiffs' case has been devoted principally to establishing by testimonial and other evidence what the commercial meaning is.

On the other hand, while the Government has also offered evidence as to the meaning of the term "huaraches" in the trade and commerce of the United States dealing in such commodity, its primary position as expressed by counsel at the various hearings and in the brief filed in its behalf is that the doctrines of interpretation of statutes, including the rules relating to the determination of the common meaning of words and/or their commercial meaning, must yield where the intent of the lawmakers clearly appears. In this case it is contended that such intent is manifested by the definition quoted above by reason of the fact that such definition was furnished to the negotiators of the Mexican Trade Agreement prior to and during the negotiations with Mexico.

This contention is based upon the premise that the information contained in the Digests of Trade Data is of the same nature and quality as those elements of legislative history to which courts at times resort in seeking to determine the legislative intent in the use of words in statutes which are found by the courts to be ambiguous. That the word "huaraches" as found in the Mexican Trade Agreement is an

ambiguous word we have no doubt. The definitions found in the most convenient lexicons shed very little light on the nature and construction of huaraches. Thus, Webster's New International Dictionary and Funk & Wagnalls New Standard Dictionary, editions from 1936 to 1948, show the following:

Webster's New International Dictionary:

A kind of sandal;—usually *pl.* *Southwestern U. S. & Mex.*

Funk & Wagnalls New Standard Dictionary:

A sandal in common wear among the West-Indians: generally in the plural.

(Note—the word thus defined in each case is "huaracho," but Webster's New International Dictionary indicates that "huarache" is a permissible variation.)

It has been held that when the information supplied in Digests of Trade Data is pertinent to the issue involved, the court may take judicial notice of it, and it may be considered when there is ambiguity in the language used in a trade agreement. *United States* v. *Good Neighbor Imports, Inc.*, 33 C. C. P. A. 91, C. A. D. 321, and *C. H. Powell Co.* v. *United States*, 34 C. C. P. A. 29, C. A. D. 340.

In neither of those cases, however, was it held that such information was of the nature and quality of the elements of legislative history, such as reports of committees, statements of those having charge of a bill, etc., which, when clearly resolving an ambiguity, the courts have accepted as indicative of the legislative intent. In fact, in the *Good Neighbor Imports, Inc.*, case, *supra*, the court said:

\* \* \* Such information is not binding upon the court but it may be considered as bearing upon the identity of the merchandise under consideration.

Certainly, in the case of statutory words of ambiguous or doubtful meaning, the clear indication of the legislative intent as to such words, as revealed by the history of the bill or act in which the words appear, is binding on the courts, for no rule is better settled than the one that in the interpretation of statutes the legislative intent shall be carried out. Hence, the fact that the Court of Customs and Patent Appeals in the excerpt just quoted from the *Good Neighbor Imports, Inc.*, case characterized the information supplied by the Digests of Trade Data as "not binding upon the court" but stated that the same "may be considered as bearing upon the identity of the merchandise under consideration," indicates that such information is not considered to be in the category of such manifestations of legislative intent which supersede all rules of statutory interpretation and construction.

We must, therefore, reject the argument of counsel for the defendant that the information supplied by the Digests of Trade Data, and specifically the description therein of huaraches, is so expressive of the intent of the negotiators of and the parties to the Mexican Trade

Agreement that all other methods of determining the meaning of doubtful words should be disregarded.

As has been said, it has not been established nor does it appear to be seriously contended that the commercial meaning of the term "huaraches" differs from the common meaning thereof. Therefore, the doctrine of commercial designation is not here invoked. Much testimony as to the meaning of the term in the trade and commerce of the United States which deals in huaraches was offered by both parties. Since in this case there is no contention that the commercial meaning of the term differs from the common meaning thereof, this testimony, even though directed to the commercial meaning of the term, is applicable to the common meaning. As the common meaning of the term is a question of law for the court to determine, such testimony in this situation is advisory only, and not binding upon the court, as it is offered as an aid to the determination of the common meaning of the term.

There does not seem to be any question but that the word "huarache" is a Spanish word and has come into our language by way of Mexico. Originally, it seems to have referred to a type of sandal worn by the Indians in Mexico made by weaving, apparently as a continuous process, an upper or vamp out of a strip or strips of leather, and at the same time fastening the upper to an insole by lacing it through holes or slots in the insole. The insole and upper thus fashioned were attached to the outsole by means of stitching or nailing. Being a primitive item, there was probably no machine work on it, and, being a sandal, it was very likely heelless.

It would seem logical and probable that as the art of making huaraches progressed, and as the acquisition of machines, such as sewing machines, became more widespread, various features were added, such as more intricate or attractive styles of weaving, different methods of attaching or holding the huarache to the foot, etc., but always, it appears the basic features of a woven upper or vamp laced to the insole were retained as the features distinguishing huaraches from other types of footwear.

Not all of the witnesses, even those called by the same party, were in agreement as to what was regarded as huaraches in the footwear trade of the United States at the time of the negotiation and promulgation of the Mexican Trade Agreement, *supra*. Thus, some of plaintiffs' witnesses who demonstrated experience in the purchase and sale of huaraches in the United States regarded the woven upper as the only distinguishing feature of huaraches, and the method of fastening the upper to the insole, e. g., by lacing, was regarded as immaterial. Other witnesses for the plaintiffs, equally experienced, considered that the upper must be at least partly woven and at least partly laced to the insole in order that the article be a huarache.

Witnesses for the defendant distinguished huaraches from conventional footwear with woven material substituted for solid material by denominating the latter as "woven footwear" or "woven shoes." Two of defendant's trade witnesses described huaraches as footwear with woven uppers which are attached to the insole by lacing through holes in the insole, the insole being fastened to the outsole by being stitched on a Goodyear machine.

Some of the exhibits at bar are held to the foot by means of a leather thong, which in some cases is attached to the sole of the exhibit and in other cases is attached to the back or counter (referring by the use of the word "counter" to that part of a shoe which surrounds the wearer's heel). Others are held on the foot by means of a strap with a buckle, while still others are held by means of the conventional lace through the upper part of the vamp. Some have no fastening present as such but have either what is popularly known as a "sling back" or a fastened or closed counter which serves to hold the article to the foot.

Apparently the method of fastening the article to the foot is immaterial in the determination of whether or not such article is a huarache, and we have consequently disregarded it as a factor in this case. So, also, the matter of the presence or absence of a counter, or back.

It is apparently the defendant's position that the true huarache is made with a so-called "open back," either having no back or having a sling back not fastened at the bottom. Defendant's own trade witnesses are at variance on the point, and we are satisfied that the presence or absence of a back or counter is immaterial in the determination of whether or not an article of footwear is a huarache.

We are likewise satisfied that the presence or absence of a heel, or whether the heel is a wedge-type heel or is nailed or fastened in any other manner, is not determinative of whether or not an article of footwear is a huarache.

While we are here seeking to determine the meaning in the United States, both commonly and commercially, of the word "huaraches" at the time of the negotiation and promulgation of the Mexican Trade Agreement, *supra*, it must be remembered that the word is a Spanish word, is particularly Mexican, and appears in a trade agreement to which there were two parties, Mexico and the United States. We, therefore, think that the statement of plaintiffs' witness Dagen as he was stating his understanding of the term "huaraches" that, among other things, they are "a type [of footwear] generally worn in Mexico" is particularly apt and must be borne in mind.

A careful perusal of all of the evidence offered, as well as such research as the court has been able to conduct, leads to the conclusion that "huaraches," as the term was understood both commonly and commercially in the United States at the time of the negotiation and promulgation of the Mexican Trade Agreement, referred to footwear

of a type generally worn in Mexico having as its distinguishing features a woven upper which was laced to the insole, the latter being fastened to the outsole generally, but not necessarily, by machine stitching.

In using the term "woven upper" we do not believe this necessarily means a wholly woven upper. Witnesses for the defendant denominated exhibit 11 as a huarache, and examination of the same indicates that while the upper is woven, nevertheless, it does not consist wholly of strips of leather but consists partly of a solid piece of leather containing slits through which leather strips are woven, the latter being laced through slots in the insole.

By the same token, we do not mean to be understood as considering as a woven upper in connection with huaraches a solid piece of leather cut in the form of a vamp and containing strips of leather interwoven for decorative effect only, the strips not being laced through the insole, as is the case of exhibit 26.

We recognize, too, that there is an accepted variation in the construction of a huarache in which the insole is not a separate piece of leather from the outsole but is merely a so-called "split," or slit piece of leather, the top being the insole and the bottom the outsole, the holes through which the woven upper is laced being in the top of the split.

Tested by the above, exhibits 1, 16, 21, 24, 26, 29, and 31 are not huaraches. In the case of exhibits 1 and 21, the vamp consists of a solid piece of leather containing slits through which are woven strips of colored leather. In each case, a few of such strips are laced through the insole, but by far the greater portion of the vamp is held to the insole by stitching and not by lacing.

In the case of exhibit 16, the vamp consists of a solid piece of leather through which are woven strips of different colored leather for decorative purposes only, none of them being laced through the insole. The upper is apparently held to the insole by gluing or tacking.

In the case of exhibits 24, 26, 29, and 31, the vamps consist of solid pieces of leather through which are woven strips of different colored leather for decorative purposes only, none of them being laced through the insole. The upper is apparently held to the sole by a braiding of varicolored strips of leather, not in the manner or fashion in which huaraches are held together.

By the same tests, exhibits 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 19, 20, 22, 23, 25, 27, 28, 30, 32, 33, 34, 36, 37, 38, 39, 44, 45, and 46 are huaraches. It should be noted that in exhibits 45 and 46 the uppers consist of solid pieces of leather containing slits through which are woven leather strips which are laced to the insoles. The same stitching which holds the outsole to the insole also passes through the solid leather portion of the upper, so that it is held not only by the traditional lacing of the huarache but also by a sewing. These

exhibits, however, meet all the tests of huaraches, and we do not believe that the extra sewing takes them out of that category. The claim in each of the protests as to the items represented by the foregoing exhibits is therefore sustained, and judgment will issue accordingly.

As to the merchandise claimed to be entitled to the 10 per centum rate of duty under the Mexican Trade Agreement provision for "Slippers (for housewear)," we find that exhibits 41 and 42 consist of articles recognized by all witnesses interrogated on the point as slippers for housewear. It appears that in both cases the merchandise was assessed with duty at the rate of 30 per centum ad valorem under the provision in paragraph 1530 (e), as modified by Presidential proclamation, T. D. 45311, for "boots and shoes, made wholly or in chief value of leather, not specially provided for, sewed or stitched by the process or method known as McKay." The competition in classification is, therefore, between the foregoing provision and the provision in the Mexican Trade Agreement, T. D. 50797, for "Slippers (for housewear)." We are satisfied that the latter provision is such a special provision for the footwear involved as removes it from the purview of the provision for McKay-sewn boots and shoes. The claim made by amendment to protest 122689–K, covering these articles, is therefore sustained, and judgment will issue accordingly.

Exhibit 43 consists of an article of footwear identified by witnesses for both plaintiffs and defendant as a slipper for housewear. Judgment will therefore issue sustaining the claim made by amendment to protests 120694–K, 120695–K, and 122689–K, as to that item accordingly.

Exhibit 40 is an article of footwear of the sandal type, the vamp consisting of a solid piece of leather slit into four strips on each side, each strip being drawn through a slit in the insole and sewed between the insole and the outsole. As the upper is not laced to the insole it is not a huarache. As to whether it, and exhibit 1, which has been hereinbefore described and held not to be a huarache, are slippers for housewear or for beachwear, the evidence is somewhat conflicting, but a fair preponderance thereof, including the testimony of plaintiffs' witnesses who were interrogated on the point and that of two of defendant's trade witnesses, establishes that they are slippers for housewear, and judgment will therefore issue sustaining the claim made by amendment of protests 120694–K, 120695–K, and 122689–K with respect to those items.

This disposes of all of the items under contest. Counsel limited the claims under the protests to the footwear items represented by the samples received in evidence. Schedule "A," attached to and made a part of this decision, identifies the enumerated exhibits with the item numbers or invoice descriptions represented thereby in the

case of merchandise as to which the protest claims have been sustained. It has been established by uncontradicted testimony offered on behalf of the plaintiffs that wherever in the invoices covered by the entries in the protests at bar each such item number or invoice description appears, it always identifies the same style. Consequently, the item numbers and/or invoice descriptions listed in Schedule "A" are applicable to all of the invoices covered by the entries involved therein.

It will be noted that exhibit 1, which has been held not to be a huarache but to be dutiable under the provision for "Slippers (for housewear)," is identified with the invoice description "Michito." This invoice description also identifies the merchandise represented by exhibit 21, which has been held not to be a huarache. There is no contention that exhibit 21 is a slipper and examination of the same discloses that while it has the same style of weaving as exhibit 1, its construction is not that of a slipper. Consequently, the protests covering the merchandise represented by exhibit 21, i. e., 121021–K and 126836–K, must be overruled insofar as they relate to that item.

As to all other items or invoice descriptions than those appearing in Schedule "A," and in all other respects, the protests are overruled, and judgment will issue accordingly.

CONCURRING OPINION

Cole, Judge: My views set forth in *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 22 Cust. Ct. 158, C. D. 1175, questioning the jurisdiction of the division to decide a case somewhat similar to these proceedings, continue as the minority expression from the division. Under the practice and procedure of the court and the rules applicable thereto, much litigation before the court is dependent upon my participation in a decision of the same. Adhering, however, to my views expressed in the *Bush* case, *supra*, but for the purpose of expediting the work of the court, I am joining my colleagues in the disposition of this case, and concur in the opinion and judgment attached hereto.

SCHEDULE "A"

| Exhibit No. | Invoice Description or Item No. |
|---|---|
| 1 | Michito (except items of this description appearing on invoices covered by protests 126836–K and 121021–K) |
| 2 | 84–A |
| 3 | Selectita |
| 4 | 55 |
| 5 | 9876–P, Women's Roman |
| 6 | Roman Perf., 9876, Women's Roman |
| 7 | Aztecita |

| Exhibit No. | Invoice Description or Item No. |
|---|---|
| 8 | Mazatlan |
| 9 | Zochil |
| 10 | Roman Nino |
| 11 | 1479, Women's Monk |
| 12 | Model 800, Multicolor |
| 13 | Selecta |
| 14 | Selectita |
| 15 | Mazatlan |
| 17 | 3–W Natural |
| 18 | Chapala |
| 19 | Model 900, Multicolor |
| 20 | Pachuco |
| 22 | Princesita |
| 23 | Zochil |
| 25 | Aztec |
| 27 | Curiosita |
| 28 | Corita |
| 30 | Militar |
| 32 | 5231, Peineton |
| 33 | Cora |
| 34 | Potro Ojillado para Mujer |
| 36 | Potro |
| 37 | Picadito |
| 38 | Picado |
| 39 | Especial |
| 40 | Cocori |
| 41 | 3058 |
| 42 | 3052 |
| 43 | Antina |
| 44 | S–61–091 |
| 45 | S–61–166, M61–105 |
| 46 | M61–107 |